■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAFAEL LORA, Appellant. [925 NYS2d 38]—

Judgment, Supreme Court, Bronx County (Margaret L. Clancy, J.), rendered June 11, 2009, convicting defendant, after a nonjury trial, of manslaughter in the second degree, and sentencing him to a term of 1 to 3 years, reversed, on the law and on the facts, and the indictment dismissed.

Defendant was charged in a one count indictment with manslaughter in the first degree (Penal Law § 125.20) based on the allegation that "with intent to cause serious physical injury to Fermin Arzu, [defendant] did cause the death of Fermin Arzu by shooting him with a handgun." At the time of the shooting, defendant was an off-duty police officer.

At trial, defendant testified that on May 17, 2007, at 11:30 P.M., after hearing a loud noise that sounded like a shotgun blast, he exited his home to investigate the commotion. Seeing that a van had hit two parked cars, defendant approached it with the primary intent of aiding its driver. Nevertheless, "for precautionary reasons," he kept his weapon out and carried it in a "bladed" position (pointed toward the ground and concealed near his right leg, so as to not alarm the public), a tactic he learned in the military and the police academy.

Defendant further testified that he opened the driver's-side door with his left hand and was inside the triangle-shaped area between the open door and the van's B pillar, the area between the front and back section of the van. Since the air bags had been deployed, he did not have a good view of the van's interior. Defendant identified himself as a police officer and asked Mr. Arzu, who was not verbally responsive, for his license and registration. Mr. Arzu leaned towards the glove box, but returned to his slouched position with nothing in his hands. At that point, a bystander came around the front of the van and distracted defendant, at which time Mr. Arzu threw something that hit defendant's mouth, chipping his tooth, and started to pull the door closed. The van then started to move ahead slowly with defendant trapped between the door and the frame. De-

fendant then commanded Mr. Arzu to stop. When the van, which was picking up speed, continued to drag him, defendant, fearing for his life, intentionally fired his weapon repeatedly in an effort to extricate himself, stopping when he was freed. As a result, defendant suffered injuries to his right elbow and arm, which was put into a sling and iced by an emergency medical technician (EMT).

Defendant's testimony that he was dragged was corroborated by one of the People's witnesses, Damaris Marrero. Ms. Marrero was at defendant's house when she heard a loud crashing sound and an alarm. She went out and saw that a red minivan had hit two cars and was stopped in a dark area near a stop sign. The van was smoking, and she heard a "vroom" sound, the kind of sound produced when someone hits the gas pedal. Ms. Marrero said that defendant approached the van with his gun pointing down the back of his right thigh and opened the driver's door with his left hand. Standing between the door and the driver's seat, defendant appeared to be talking to the driver when the "car moves and [defendant] is snapped and caught, jerked to left along with car." "[I]t looks like he's being dragged by the car and then he's trying to regain his footing, and he's trying to move back." Defendant then lunged forward, and Ms. Marrero heard three shots fired.

Other witnesses called by the People also provided partial corroboration of defendant's account.

Myra Carreno looked out of her window and saw the van near a stop sign, with a man running toward it from behind. The man had a conversation with the driver, but she could not hear the words. She saw that the door of the minivan was open and the man was inside the door, so that if the van door were to be shut, it would hit the man. When Ms. Carreno saw that the man had a gun in his right hand, she got scared and moved away, and only heard the shots.

Oscar Carreno saw the damaged and smoking van near the stop sign with its horn blaring. He was under the impression that whoever was in the van wanted to keep going. Mr. Carreno saw a man stop by the van and disappear from view. As he moved to another window to get a better view of the van, which was jerking forward, Mr. Carrero heard four shots in about 1¹/₂ seconds. He never saw a man with hands out pointing towards the back of the van.

Ernesto Cervantes was hanging out with his friends when he heard the crash. He walked to the scene and stopped right in front of the van and saw a man talking to the driver. As he walked away, he heard about five gunshots and saw a man run-

ning after the van. He did not see the shooting and never saw the man in a shooting position.

In contrast to his trial testimony, at one point during his grand jury testimony, defendant had testified that "somehow I broke loose, and I fired the weapon." In his statements to first responders at the scene, defendant indicated that he was struck by the van, without any mention of being dragged. One EMT testified that defendant told him he had not been dragged. However, nothing in the EMT's report indicated that defendant had been asked if he had been dragged, and the EMT did not recall if he had been asked about defendant's being dragged when he testified before the grand jury and Internal Affairs. Another report indicated "elbow pain caused by being hit by automobile's B post of car."

George Vargas, who viewed the incident from a window in his apartment, testified that he saw the man go to the driver's side of the van and talk to the driver. He could not see if the man had a weapon in his hands or if the man got into or put his hands in the van, because it was dark. He could not tell if the van door was open or closed. Mr. Vargas left the window momentarily and, after hearing shots, saw the man in a firing position at least two car lengths away from the van, which had moved into the intersection. He did not see the shooting itself and could not say what the man, who may have been nicked by the van because he was so close to it, was doing at the time the shots were fired.

Juana Fernandez heard a horn and looked out of a 1½-inch opening in her bathroom window. She saw the van stopped at the corner and a man behind it. The van suddenly started to move quickly, and the man, who was standing behind it, raised his hands forward, and about two to three seconds later fired three to four times very fast.

Dr. Margaret Prial performed the autopsy. She opined that the cause of Mr. Arzu's death was "gunshot wound of trunk with perforation of heart, left lung, & aorta." A single bullet entered his left middle-upper back, passed downward through his left lung, perforated his heart and aorta, and lodged in his chest wall. Since there was no bullet hole in the seat, Dr. Prial suggested that Mr. Arzu's back would have been exposed if he was leaning forward in the seat at the time he was shot. She could not rule out defendant's explanation of the shooting, which she said, with a reasonable degree of scientific certainty, could have occurred as Mr. Arzu was leaning forward to close the open door with his left hand at the time the shots were fired.

The People's expert, Dr. Peter DeForest, opined that since the five shell casings at the scene were found close together, the gun was "comparatively stationary" when the shots were fired and the shooter was very close to the car. According to Dr. DeForest, the testimony that the weapon was not fired until the vehicle was 15 feet away would not be consistent with the physical evidence, and that it was clear that the fatal shot did not come from someone running behind the car.

Dr. DeForest said that defendant's story was not inconsistent with the physical evidence. Since there were no bullet holes in the seat, Mr. Arzu was not flush with the seat at the time he was shot, and could have been leaning forward to close the door with his left hand. Although Dr. DeForest said that defendant could have been trapped in the vehicle when the door was shut and could have fired the first shots while in the van and the later shots as the van passed him, the evidence did not indicate whether or not the shooter was being dragged by the van when he fired the shots.

Emanuel Kapelsohn, a firearms and shooting reconstruction expert, testified for the defense that defendant's approach to the van with his weapon drawn and pointed downward was not improper, because defendant thought the initial sound of the collision between the van and the cars could be a gunshot. He agreed with the People's expert that the forensic evidence showed that the first two shots hit Mr. Arzu or the B pillar and that the others were fired as the van drove away. The fatal shot was fired very close to the van, probably from within the doorway, and Mr. Arzu may have been leaning forward when he was shot. Mr. Kapelsohn said that the forensic evidence was consistent with defendant's being inside the front door, being dragged by the van, and discharging his weapon "in an attempt to extricate himself from the vehicle." The fatal shot could not have been fired from 20 to 30 feet away.

After the defense rested, the People asked the court to consider the lesser included offenses of manslaughter in the second degree (Penal Law § 125.15 [1]) and criminally negligent homicide (Penal Law § 125.10). The People argued that by pulling his weapon after he had learned that this was an accident scene, defendant put himself "in a reckless position" where he could fire the weapon either intentionally or inadvertently. The People further argued that defendant testified that he fired after something was thrown at him but did not testify that he deliberately fired the shots. Defense counsel countered that defendant testified that he fired intentionally to extricate himself from the van as it dragged him, and stopped shooting when the

threat was extinguished, and that there was no expert evidence that any of his tactics were negligent or reckless. The court granted the People's request.

The court found defendant guilty of manslaughter in the second degree, and on June 11, 2009 sentenced him to an indeterminate term of 1 to 3 years. However, the court stayed execution of the sentence and permitted defendant to remain out on bail, stating it "is aware of the issues in the case, even the issues presented on sentencing for the Appellate Division."

By order entered on or about June 17, 2009, the court denied defendant's motion to vacate the conviction. The court found that second-degree manslaughter was properly charged in that "the trier of fact could find, depending on which testimony the court credited regarding the circumstances of the shooting, that although the defendant intentionally pulled the trigger, he either intended to cause serious physical injury, was aware of and consciously disregarded the substantial and unjustifiable risk of death, or failed to perceive that risk." The court found that the verdict was not against the weight of the evidence because, "[v]iewing the evidence in the light most favorable to the People, the court could have rejected defendant's trial testimony that he was dragged by the car and, instead, credited his post-shooting on-the-scene statements that the car hit him and he fired his weapon." The court found that this, along with other evidence, was legally sufficient to support a finding that defendant acted with a reckless mental state, i.e., "that his conscious objective was not to cause serious physical injury, but that he fired his weapon under circumstances which showed that he, as a police officer, was aware of but consciously disregarded the substantial and unjustifiable risk that death would occur."

We now reverse.

"A person is guilty of manslaughter in the first degree when . . . [w]ith intent to cause serious physical injury to another person, he causes the death of such person" (Penal Law § 125.20 [1]). "A person acts intentionally with respect to [first-degree manslaughter] when his [or her] conscious objective is to cause [serious injury]" (Penal Law § 15.05 [1]). "A person is guilty of manslaughter in the second degree when . . . [h]e [or she] recklessly causes the death of another person" (Penal Law § 125.15 [1]). "A person acts recklessly with respect to [second-degree manslaughter] when he [or she] is aware of and consciously disregards a substantial and unjustifiable risk that [death] will occur . . . The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law § 15.05 [3]).

A party requesting the submission of a lesser included offense must demonstrate that "it is impossible to commit the greater crime without concomitantly . . . committing the lesser offense," and that "the [factfinder] would be warranted in finding that the defendant committed the lesser but not the greater crime" (*People v Glover*, 57 NY2d 61, 63, 64 [1982]). A lesser included offense may not be submitted unless there appears on the whole record "some identifiable, rational basis" for the factfinder to reject evidence indispensable to establishing the greater crime yet accept so much of the evidence as would establish the lesser (*People v Scarborough*, 49 NY2d 364, 369 [1980]). Submission of reckless manslaughter as a lesser included offense of intentional manslaughter is inappropriate where there is no reasonable view of the evidence that would support a finding that the defendant was unaware of the substantial and unjustifiable risk of death caused by his actions (*see People v Heide*, 84 NY2d 943 [1994]), such as when the defendant admits that he acted intentionally (*see People v Roman*, 183 AD2d 925 [1992], *lv denied* 80 NY2d 909 [1992]) or shoots the victim repeatedly at close range (*People v Etienne*, 250 AD2d 776 [1998], *lv denied* 92 NY2d 896 [1998]).

Applying these standards, the trial court erred in considering the lesser included offense of manslaughter in the second degree, over defendant's objection, because there is no reasonable view of the evidence that defendant did not intend to cause serious physical injury. No witness testified that defendant accidentally discharged his weapon. The only version of the incident that was discredited by the physical evidence was the testimony of Vargas and Fernandez implying that defendant assumed a shooting position and fired from a distance behind the van. Whether defendant was dragged or merely struck by the van when he was partially inside it, the evidence shows that he shot Mr. Arzu at very close range, from mere inches to a couple of feet away. While it is true that the fact that an act was deliberate does not necessarily preclude a finding of recklessness (*see People v Heide*, 84 NY2d at 943), "[n]othing in the evidence undermine[s] the inference that, when defendant deliberately [fired four or five shots in 1.5 seconds or less at Mr. Arzu at close range], he did so with intent to cause, at least, serious physical injury, a natural consequence of such act" (*People v Barnes*, 265 AD2d 169, 169 [1999], *lv denied* 94 NY2d 877 [2000]; *see also People v Cesario*, 71 AD3d 587, 587 [2010], *lv denied* 15 NY3d 803 [2010], *cert denied* 562 US —, 131 S Ct 670 [2010] ["The court properly declined to submit manslaughter in the second degree as a lesser included offense . . . Since defendant had to squeeze the trigger of his semiautomatic weapon

nine separate times, there is no reasonable possibility that the weapon was discharged through careless handling. Furthermore, nothing in the prosecution or defense case tended to explain why defendant would fire nine shots, other than to hit his victims"]; *People v Rodriguez*, 262 AD2d 140, 141 [1999], *lv denied* 93 NY2d 1026 [1999] ["The court properly declined to charge manslaughter in the second degree as a lesser included offense, since there was no reasonable view of the evidence which would support a finding that defendant fired eight shots into his unarmed victim without, at least, the intent to cause serious physical injury"]).

In finding that the second-degree manslaughter charge was appropriate, the dissent states that defendant "denied that he had the intent to cause serious physical injury to the driver." In support, the dissent cites defendant's testimony that when he first approached the vehicle his primary intent was to render aid, not to arrest the driver. However, taken in context, defendant's testimony that he wanted "to get [Mr. Arzu] the aid that he needed as quick as possible," referred to his intention at the time of his approach to the van, not his intention at the time of the actual shooting (*cf. People v Abreu-Guzman*, 39 AD3d 413 [2007], *lv denied* 9 NY3d 872 [2007]). In that regard, defendant testified that he intentionally fired to extricate himself from the vehicle as it dragged him. Even if that testimony was properly discredited by the trial court, that would impact on defendant's justification defense, but would not alter the fact that all versions of the shooting support the inference that defendant intentionally fired four or five shots in 1.5 seconds or less at Mr. Arzu at close range, intending to cause, at a minimum, serious physical injury—which negates any theory of recklessness (*see People v Barnes*, 265 AD2d at 169; *People v Frazier*, 156 AD2d 583 [1989], *lv denied* 75 NY2d 868 [1990] [trial court correctly refused to charge second-degree manslaughter where "[t]he evidence at trial established that the victim was shot at close range with two blasts from a shotgun which the defendant had taken to the scene of the shooting. Additionally, the defendant's statement indicated that he had intentionally fired the weapon at the victim"]). Nor, as discussed below, was there evidence that established beyond a reasonable doubt that defendant acted recklessly when he approached the van with his weapon drawn. The People provided no proof as to what a reasonable police officer would have done in defendant's position or that applicable police rules or regulations were violated.

Accordingly, because the evidence at trial, including defendant's own testimony, in which he admitted intentional conduct,

negated any theory of recklessness, the trial court should have refused to consider second-degree manslaughter as a lesser included offense (*see People v Smith*, 87 AD2d 640 [1982], *lv denied* 56 NY2d 814 [1982]; *People v Solano*, 52 AD3d 848 [2008], *lv denied* 11 NY3d 795 [2008]). Since the sole charge of which defendant was convicted was the improperly considered charge of manslaughter in the second degree, the indictment must be dismissed (*People v Strawder*, 78 AD2d 810 [1980]).

Alternatively, even had it been proper to consider the lesser included offense of manslaughter in the second degree, we would find that the verdict was against the weight of the evidence, which did not establish the element of recklessness. "[W]eight of the evidence review requires a court first to determine whether an acquittal would not have been unreasonable" (*People v Danielson*, 9 NY3d 342, 348 [2007]). "If so, the court must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions. Based on the weight of the credible evidence, the court then decides whether the [trier of fact] was justified in finding the defendant guilty beyond a reasonable doubt" (*id.*). "If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict" (*People v Bleakley*, 69 NY2d 490, 495 [1987]).

As set forth above, in support of their request for consideration of the lesser included offense of manslaughter in the second degree, the People advanced the theory that by pulling his weapon at a point when he knew it was an accident scene, defendant put himself in a reckless position where he could fire the weapon either intentionally or inadvertently. Thus, the People had to prove beyond a reasonable doubt that defendant, by approaching the crash scene with his weapon drawn, was "aware of and consciously disregard[ed] a substantial and unjustifiable risk" and that to disregard that risk constituted "a gross deviation from the standard of conduct that a reasonable [police officer] would observe in the situation" (Penal Law § 15.05 [3]). However, the evidence presented at trial was consistent with the People's original theory that defendant consciously decided to fire his weapon, with the intention, at a minimum, to cause serious physical injury to Mr. Arzu, and there was no evidence to support the People's revised theory that he acted recklessly or negligently in drawing his weapon in the first instance. Again, even if defendant fired after being hit by the van, rather than after being dragged by it, that would go to the merits of his justification defense, but would not in and

of itself convert his act of firing five shots in 1.5 seconds or less at Mr. Arzu at close range from an intentional attempt to cause at least serious injury into a reckless act.

The People's belated reliance on New York Police Department (NYPD) Patrol Guide § 203-12 (g) ("Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle") does not alter this conclusion. The People made a calculated decision not to present at trial evidence as to police rules and procedures regarding the circumstances under which an officer may approach an accident scene with his or her gun drawn, and to raise that issue for the first time on appeal. Although rules of police procedure need not be offered into evidence for a court to take judicial notice of it, "a description of what the procedure requires must be proffered," and that was not done here (*see People v Gomez*, 13 NY3d 6, 11 [2009]; *see also Arias v City of New York*, 22 AD3d 436, 437 [2005] [summary judgment for City warranted in absence of evidence that officers' actions were inconsistent with proper police practice]).

Citing *People v Colecchia* (251 AD2d 5 [1998], *lv denied* 92 NY2d 895 [1998]), the dissent maintains that the fact that no expert testimony was offered by the People as to whether it was proper for a police officer to approach the car with his weapon out and to leave it unholstered, is inconsequential. In *Colecchia*, this Court found that expert testimony on police training and guidelines was not essential to establish the police officer's recklessness. However, unlike in *Colecchia*, here there is no "overwhelming evidence" (251 AD2d at 6) that defendant acted recklessly in unholstering his weapon in the first instance and in keeping it at his side as he approached the crash site.

"In evaluating the propriety and reasonableness of the actions by the police, we must take cognizance of the realities of urban life in relation to the dangers to which officers are exposed daily, which often require split-second decisions, with life or death consequences" (*People v Reyes*, 91 AD2d 935, 936 [1983]). Defendant testified that he thought the noise he heard at 11:00 P.M. was a gunshot. This belief was not unreasonable. Indeed, other witnesses testified that they were familiar with the sound of gunfire because they had heard it before in the neighborhood. There were people in the vicinity of the van, which was in a dark area, and defendant, who approached without backup, did not have a good view of the van's interior.

Given these circumstances, it cannot be said that defendant's approach to the van was not inherently dangerous (*compare*

*Pennsylvania v Mimms*, 434 US 106, 110 [1977] [routine stops for traffic violations are inherently dangerous to police officers]; *People v Rodriguez*, 81 AD3d 404 [2011] [same]). Thus, absent proof of the proper police procedures for approaching any situation with a gun, there is an insufficient basis in the record to determine, under the particular circumstances of this case, that the risk created by defendant's actions in unholstering his weapon when responding to the accident scene was unjustifiable and constituted a gross deviation from the standard of conduct that a reasonable officer would have observed.

Indeed, to the extent that there was evidence by which to evaluate the reasonableness of defendant's police tactics, the evidence did not support the guilty verdict for reckless manslaughter (*see People v Conway*, 40 AD3d 455 [2007]). The defense expert, Mr. Kapelsohn, testified that defendant's approach to the van with his weapon drawn and pointed downward was not improper because defendant thought the initial sound of the van colliding with the cars could be a gunshot. Defendant explained that he kept his weapon in the "bladed" position, even after he observed that the van had been in an accident, because he still did not know what he would walk into or what would come up, since the van was in a shaded area, its windows were dark, and the cause of the accident and number of the van's occupants were unknown. Further, defendant had no radio, cell phone, partner or Kevlar vest; his weapon was his only line of defense. Neither Mr. Kapelsohn's nor defendant's testimony was rebutted.

Contrary to the dissent's contention, this analysis is not contingent on a rejection of the trial court's credibility findings, or the acceptance of defendant's contention that he was dragged by the van. Rather, it is based on the fact that without guidance from the relevant NYPD procedures, it is not evident that defendant, in his particular situation, acted unreasonably when he drew his weapon, let alone that he "grossly deviated" from the standard of conduct of a reasonable police officer, which was the theory on which the People based its request for the second-degree manslaughter charge. Accordingly, the weight of the evidence, as to culpability, to the extent there was any evidence at all, was that defendant's conduct in drawing his weapon when he first approached the van was "not so culpable as to warrant a finding that any such negligence rose to the level of criminality" (*see Conway*, 40 AD3d at 456).

We have considered and rejected the People's remaining arguments. Concur—Andrias, J.P., Friedman and Manzanet-Daniels, JJ.

Richter, J., dissents in a memorandum as follows: The trial court, in this nonjury trial, properly considered the lesser included offense of manslaughter in the second degree and its verdict was fully supported by the credible evidence. There is no dispute that manslaughter in the second degree (Penal Law § 125.15 [1]) is a lesser included offense of manslaughter in the first degree (Penal Law § 125.20 [1]), which is the crime charged. The critical question on this appeal is whether there is a reasonable view of the evidence to support a finding that defendant committed the lesser included offense but not the greater. That analysis turns on whether defendant's actions can only be viewed as evidencing an intent to cause serious injury or whether the evidence also supports a finding that defendant acted recklessly in firing his weapon.

"[A] refusal to charge a lesser included crime is warranted only where every possible hypothesis but guilt of the higher crime [is] excluded" (*People v Johnson*, 45 NY2d 546, 549 [1978] [internal quotation marks and citations omitted]). In deciding whether, under any reasonable view of the evidence, the trier of fact could acquit defendant of the higher count and still find him guilty of the lesser one, the court must be guided by the principle that the trier of fact is free to accept or reject all or any part of the evidence (*People v Henderson*, 41 NY2d 233, 236 [1976]; *People v Fernandez*, 64 AD3d 307 [2009]).

Although defendant, in his direct testimony, sought to establish that he intentionally shot the victim to extricate himself from the victim's van, the record, including defendant's statements immediately following the shooting, supports a finding of recklessness. "A person acts recklessly" with respect to second-degree manslaughter "when he is aware of and consciously disregards a substantial and unjustifiable risk that [death] will occur" (Penal Law § 15.05 [3]). Here, defendant explained that he approached the van, which had been involved in an automobile accident outside his home, and opened the door to see if the driver was okay. The air bag had been deployed, and the driver was nonresponsive. Defendant asked the driver for his license, registration, and insurance card, but the driver was still nonresponsive. Defendant, who had positioned himself in the open door on the driver's side of the van, claims that the driver pulled the door shut, trapping defendant in the door. The driver then started the car, but it did not catch the gear properly. According to defendant, he remained trapped in the door as the driver ultimately moved the vehicle forward. He claimed that he was running alongside the vehicle, with his body still trapped in the door. Somehow, defendant got "jerked," he fired his weapon,

which was in his right hand, and the door was released. The record establishes that defendant fired five shots in 1.2 seconds.

Although defendant testified that he fired the gun to extricate himself from the car, he denied that he had the intent to cause serious physical injury to the driver. He confirmed that when he first approached the vehicle, his intent was to render aid and not to arrest the driver. Yet, even after he determined that the driver was nonresponsive and dazed, he did not put his gun away. The medical evidence presented at trial showed that the fatal bullet was fired from behind, entering the victim through his upper left back. Based on this testimony, the court could have found that defendant, an experienced police officer and a Marine Corps veteran, acted recklessly when he fired his gun in the victim's direction by consciously disregarding the risk of firing at such close range (see People v Abreu-Guzman, 39 AD3d 413 [2007], lv denied 9 NY3d 872 [2007]). Thus, the court, as the trier of fact, properly considered the lesser included offense.

The court's decision to consider and to convict on the lesser offense also can be supported by the statements defendant made to other police officers and to medical personnel at the scene immediately following the shooting. These statements establish that defendant was standing next to the car, which brushed his elbow, and that he fired the gun at the car in response. Defendant never told any of the emergency responders that he was dragged by the vehicle. In fact, one paramedic specifically asked defendant if he had been dragged, and defendant said he had not. Before the grand jury, defendant testified that he broke loose and then fired his weapon. These statements are inconsistent with defendant's trial testimony in which he sought to establish that he intentionally fired the gun so that he would be released from the vehicle. If, as defendant's statements at the scene indicate, defendant was firing from outside the vehicle at close range but did not intend to seriously injure the driver, his actions provide a basis for a finding of recklessness.

The majority concludes, with no convincing explanation, that the verdict was against the weight of the evidence. "[A]ppellate courts have been careful not to substitute themselves for the [trier of fact]," and "[g]reat deference is accorded to the factfinder's opportunity to view the witnesses, hear the testimony and observe demeanor" (People v Bleakley, 69 NY2d 490, 495 [1987]). This Court recently emphasized these principles in People v Griffin (63 AD3d 635, 638 [2009], lv denied 13 NY3d 835 [2009]), stating that "[u]nder a weight-of-evidence analysis, a court does not take the place of the [trier of fact] in passing on questions of the reliability of witnesses and the credibility of

testimony, instead it gives great deference to the [trier of fact's] findings." The trial court explicitly rejected defendant's testimony that he was trapped in the door of the victim's car and dragged. Instead, consistent with the statements made by defendant to the emergency personnel at the scene, the court concluded that defendant acted recklessly by shooting at the victim's vehicle as it drove away after it struck defendant on his side.

Although the majority states that it is not rejecting·the trial court's credibility findings, it appears that the majority is doing exactly that. The opinion recounts, in detail, defendant's trial testimony about being dragged by the car, and concludes that defendant could have been trapped in the vehicle. The majority also notes the testimony of Damaris Marrero, a friend of defendant, who claimed at trial that she saw defendant being dragged by the car. Furthermore, the majority seeks to explain away the testimony of the paramedic who recalled that defendant told him he was not dragged. That paramedic documented in a written report, prepared on the night of the shooting, that defendant said he was "struck by car as he was standing next to it as the car sped off." The majority cannot have it both ways; either it is substituting its own credibility findings for that of the trial court and accepting defendant's version of the incident or it must reject defendant's claim, as the trial court did, that he was trapped in the door when he repeatedly fired his weapon at close range.

The trial court's decision to reject defendant's trial testimony, particularly his claim about being dragged by the car, was warranted in light of the evidence and was well within its province as the trier of fact. There is no question that the air bag was deployed when defendant first approached the vehicle. Defendant acknowledged that the driver, who weighed close to 300 pounds, was dazed and unresponsive. Yet, according to defendant's trial testimony, the driver was somehow able to reach behind defendant, an experienced police officer, and exert sufficient pressure on the car door, while the car was moving, to trap defendant with his left arm squeezed into the door frame and his legs sticking out of the car. Even more implausible was defendant's claim that he would allow himself to be put in this position while he still had his gun unholstered in his right hand.

Defendant's story also makes little sense when one carefully examines the sequence of events that led to the firing of the weapon. Defendant never logically explained how his right hand was released and how he managed to raise it up so that a shot could be fired into the back left side of the victim. Although de-

fendant testified at one point that he was "jerked" by the moving car, he did not adequately explain why, once the car moved, he did not fall to the ground. Nor did he address why he did not push on the door with his arms so that he could safely free himself. Instead, he sought to convince the court that the only way he could extricate himself was by shooting the driver in the back. His testimony about shooting while being trapped in the door of a moving car also was impossible to reconcile with the testimony of the People's expert, who explained that the shots had to have been fired from a muzzle that was comparatively stationary.

Rather than credit this ludicrous story, the court was entitled to accept the far more believable statements defendant made at the scene as to how the incident occurred. These statements were made close in time to the shooting, before defendant had the opportunity to reflect and to tailor his testimony in any way. The statements also were made at a time when defendant was trying to obtain treatment for his alleged injuries, rather than later when he was trying to avoid legal liability. According to the paramedic who testified at trial, the only injury defendant mentioned was related to his right shoulder and right elbow. It is impossible to understand how defendant's right elbow could have been injured, given his description of how he was trapped in the car door, particularly because it was his left arm that was bent in what he describes as a "chicken wing" position and his right hand that was used to shoot the victim.

Despite the fact that defendant's testimony was at odds with that of other disinterested witnesses, and ignoring his obvious motive to lie, the majority seems to accept defendant's farfetched account of the events prior to the shooting. The majority focuses on the number of shots defendant fired, suggesting that this proves that defendant acted intentionally rather than recklessly. Yet, it proves no such thing because the rapid firing of several shots could just as easily establish reckless conduct. Defendant told a police officer at the scene that the victim threw something at him and he fired the gun. Whether the firing was in response to this, or to the car's briefly hitting him, the trial court's conclusion that he acted recklessly by repeatedly firing in the car's direction was supported by the record.

On appeal, defendant makes much of the fact that no expert testimony was offered as to whether it was proper for him to approach the car with his gun out and to leave it unholstered throughout the incident. This Court, in *People v Colecchia* (251 AD2d 5 [1998], *lv denied* 92 NY2d 895 [1998]), concluded that expert testimony was not required for the court to determine

whether the police officer's conduct in firing a fatal shot into the victim's back was reckless and unjustified. Here, no expert testimony was necessary for the court to find reckless conduct, based on defendant's statements made at the scene, which showed that he was not in any danger when he fired his weapon. Contrary to the majority's analysis, the trial court's decision to convict did not turn on whether defendant failed to follow patrol guide procedures, but on the fact that, facing no danger at the time, he recklessly fired at a moving vehicle, killing its occupant.

The majority tries to make this case into a referendum on the dangers faced by police officers investigating gunshots or making car stops. I do not question the difficulties faced by officers who come upon what may be a crime scene, especially before any backup arrives. But defendant acknowledged that the area outside his home was well lit, and the record establishes that he quickly realized that this was a car accident, not a potential crime scene. Defendant admitted that by the time he approached the car, he knew it was less likely that the sound he heard was a gunshot, and that it actually was a car crash. He further testified that he did not anticipate placing the driver of the car under arrest. Finally, neither defendant nor the majority adequately explains how defendant could have felt endangered when he saw the victim in the car dazed and unresponsive.*

On appeal, defendant argues that his sentence of 1 to 3 years of imprisonment was unduly harsh and should be modified in the interest of justice to a non-jail sentence. The majority, which concludes that the conviction should be reversed, does not address the question of sentence. I would also affirm defendant's sentence. At sentencing, the court considered defendant's service as a police officer, his service to his country as a Marine, and the devastation his conviction caused to his family. In fashioning a sentence, the court also appropriately considered the nature of the crime, which resulted in the loss of a life, and considered the plea of the victim's family that a jail sentence be imposed. It is obvious from reading the sentencing minutes that the decision to impose a prison sentence on defendant was a difficult one for the sentencing court. The court acknowledged the split-second decisions that police officers must make when confronted with dangerous situations on the streets of this city. But the court further noted that at the time defendant fired his weapon, there was no danger confronting him. The court

---

* The majority's reference to the justification defense makes little sense. If defendant was not being dragged, then he would have had no reasonable belief that deadly physical force was being used against him, and the justification defense would not be applicable.

exercised leniency by imposing the minimum jail sentence permissible for this offense. In this tragic case, the lower court's decision to convict and its sound exercise of discretion at sentencing should be left undisturbed.