■ The People of the State of New York, Respondent, v Stan XuHui Li, Appellant. [67 NYS3d 1]—

Judgment, Supreme Court, New York County (Michael R. Sonberg, J.), rendered December 19, 2014, convicting defendant, after a jury trial, of 2 counts of manslaughter in the second degree, 3 counts of reckless endangerment in the first degree, 3 counts of reckless endangerment in the second degree, 170 counts of criminal sale of a prescription, 1 count of scheme to defraud in the first degree, 2 counts of grand larceny in the third degree, 9 counts of falsifying business records in the first degree, and 8 counts of offering a false instrument for filing in the first degree, and sentencing him to an aggregate term of 10 to 20 years, unanimously affirmed.

Defendant was a physician specializing in pain management. In 2004, he opened a pain management clinic in Queens. According to the People, the clinic was nothing more than a "pill mill" catering to people who were hopelessly addicted to pain medicine, primarily opioids. The People's evidence showed that, despite having been trained in the wide variety of methods for identifying legitimate pain and treating it, defendant engaged in only the most cursory attempts to confirm patients' complaints, such as asking them where they had pain, and occasionally palpating a purportedly sore area or testing the range of motion of a limb. He rarely ordered diagnostic scans. Moreover, defendant, despite the plethora of options for treating pain, regularly prescribed opioids as a first resort, and not a last resort, which would have been the prudent course given the highly addictive nature of those drugs.

Further demonstrating the fact that defendant's clinic was

not focused on the legitimate practice of pain medicine, but rather profiting from the opioid addiction epidemic, is that appointments were not necessary and all payments were required to be made in cash. A typical visit would cost $100, but patients who came back earlier than a month later for their next month's prescriptions, who obtained prescriptions from other doctors or who needed more than three prescriptions or prescriptions for more than 60 mg per day of opioid were charged an additional $50. Patients usually handed the money to defendant, who placed the money directly into his pocket. Defendant often prescribed whatever medication patients requested. On occasion, he would issue a prescription without seeing the patient at all, and if he hesitated in writing a particular prescription, he could be persuaded if he was offered more money. From 2008 through October 2011, defendant wrote over 21,000 prescriptions for controlled substances, at an increasing pace, with more than half for substances containing the opioid oxycodone, and more than a quarter for alprazolam (Xanax). As explained by the People's expert, NYU Director of Pain Medicine Christopher Gharibo, Xanax, when taken with opioids, can depress respiration, making the combination particularly dangerous.

Indeed, defendant's prescription practices led to tragedy. Two of defendant's patients, Joseph Haeg and Nicholas Rappold, died within days of their last visits to defendant's clinic. Toxicological evidence revealed that Haeg's body contained over 20 times what would be considered a therapeutic amount of oxycodone—a fatal dose—and a moderately high therapeutic amount of Xanax. Although Rappold was not found to have fatal levels of either oxycodone or Xanax in his system when he died, his death was determined to have been caused by the drugs' having worked synergistically to depress his respiration. In connection with the deaths, defendant was charged with second degree manslaughter. He was also charged with first-degree reckless endangerment with respect to three other patients, and second-degree reckless endangerment with respect to four more patients. For all 19 patients at issue defendant was charged with criminal sale of prescriptions; an aggregate 180 counts of this charge were leveled. Finally, although not at issue on this appeal, defendant was charged with one count of first-degree scheme to defraud, two counts of third-degree grand larceny from Medicare and Blue Cross/Blue Shield; 11 counts of first-degree falsifying business records submitted to the Centers for Medicare and Medicaid Services; and 16 counts of first-degree offering a false document for filing with the New York State Department of Health's Office of

Professional Medical Conduct. He was convicted after a jury trial of all charges, save for one second-degree reckless endangerment count, 10 criminal sale counts, and 2 falsifying records counts.

Defendant argues that the manslaughter convictions should be reversed because, as a matter of law, the sale of a controlled substance can never support a homicide charge in the absence of express legislative authorization. He bases this position on a Second Department decision, *People v Pinckney* (38 AD2d 217 [2d Dept 1972], *affd* 32 NY2d 749 [1973]). In *Pinckney*, the defendant sold heroin, and provided the means to inject it, to the victim, who died (38 AD2d at 218). He was charged with, inter alia, manslaughter in the second degree and criminally negligent homicide (*id.*). Contrasting the sale of heroin with the sale of wood alcohol, which is known to be inherently deadly, the Court held that the defendant could not be held criminally responsible for the death, because "[a]lthough it is a matter of common knowledge that the use of heroin can result in death, it is also a known fact that an injection of heroin into the body does not generally cause death. The homicide cases involving a sale or use of an illegal drug or instrument for the purpose of causing an abortion were prosecutions . . . pursuant to express statutory provisions. There are no provisions contained in the present Penal Law which set forth that the illegal sale of a dangerous drug which results in death to the user thereof constitutes manslaughter or criminally negligent homicide" (*id.* at 219 [citations omitted]).

Defendant contends that there is no legal distinction between himself and the drug dealer in *Pinckney*, since, he claims, opioids are not even as dangerous as heroin and, in any event, he merely provided the pills, and was not present when Haeg and Rappold ingested them. He argues that, since the Penal Law, in the sections criminalizing sales of controlled substances, is silent on the consequences if a sale results in the buyer's death, his prosecution for manslaughter is without any legal basis.

We disagree. Nothing in *Pinckney* suggests that one who provides a controlled substance, whether it be heroin by a street dealer, or opioids by a medical doctor, can never be indicted on a manslaughter charge. Indeed, in *People v Cruciani* (36 NY2d 304 [1975]), the Court of Appeals affirmed the second degree manslaughter conviction of the defendant, who injected the victim with heroin, because he knew she was already in a highly intoxicated state. The *Cruciani* Court distinguished *Pinckney*, because in the latter case there was not "any proof,

as here, of awareness of the ongoing effect of drugs in the victim's body at the time any self-inflicted injection might have been made, or, beyond the general knowledge of the injuriousness of drug-taking, of a real threat to life. The remoteness of that fatal injection from the fact of sale diffused intent and *scienter* by possibly unknown or intervening events beyond Pinckney's control" (36 NY2d at 305-306).

At bottom, all that was needed for the manslaughter charge to be sustained was for the People to satisfy its elements. That is, that defendant was "aware of and consciously disregard[ed] a substantial and unjustifiable risk that [death would] occur . . . The risk [being] of such nature and degree that disregard thereof constitute[d] a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law § 15.05 [3]; *People v Lora*, 85 AD3d 487, 491 [1st Dept 2011], *appeal dismissed* 18 NY3d 829 [2011]).

The question then becomes whether the People presented sufficient evidence to establish that defendant consciously disregarded the risk that Haeg and Rappold would die as a result of his prescribing practices. Trial evidence is legally sufficient to support a conviction if, viewed in the light most favorable to the People, it could lead a rational jury to find the defendant guilty beyond a reasonable doubt (*see People v Danielson*, 9 NY3d 342, 349 [2007]). A jury's verdict is supported by sufficient evidence if the evidence presented supports "any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury" (*People v Bleakley*, 69 NY2d 490, 495 [1987]).

Defendant attacks the proof of his responsibility for Rappold's death because there was no evidence that the oxycodone that was found in Rappold's system came from defendant. Further, although there is no question that the Xanax found in Rappold's system was prescribed by defendant days before his death, and that 55 pills were missing from the bottle, defendant asserts that he should not be held responsible for Rappold's having consumed an amount of pills "monumentally and tragically beyond what had been prescribed by [defendant], as the Xanax was to be taken at only one pill (2 milligrams) three times a day, which was a common therapeutic dose (emphasis omitted)." With respect to Haeg, defendant argues that the evidence does not show that he should have anticipated that Haeg would abuse the drugs he prescribed him. For example, he states that, despite Haeg's friends' and relatives' testimony that his addiction was obvious from his physical appearance, there is no proof that he himself was informed of this or noticed anything out of the ordinary about his patient.

We find that there was sufficient evidence to convict defendant of second degree manslaughter in the deaths of Haeg and Rappold. The People's expert, Dr. Gharibo, reviewed defendant's files for all of the 19 victims at issue in the indictment, including Haeg. Citing defendant's failure to obtain sufficient background history, to confirm patient claims about medications they were already taking, to order appropriate evaluative tests, to diagnose the causes of pain, to explore nonopioid treatment, to minimize opioid dosages, and to avoid prescribing to obviously addicted patients, Gharibo identified 180 prescriptions that defendant wrote that were, in his expert medical opinion, without medical basis. Gharibo further concluded that defendant usually prescribed highly addictive opioids in much higher dosages than were reasonable, and engaged in practices that created and fostered addiction and otherwise endangered the lives of patients. Specifically with respect to Haeg, Gharibo testified that defendant prescribed unusually high dosages of oxycodone and Xanax. Haeg returned to defendant every three weeks for a month's prescription on October 17, November 14, and December 5, again receiving similar prescriptions from defendant that were not, according to Gharibo's professional opinion, medically warranted. On December 26, 2009, Haeg, who, according to the testimony of friends and family members, was exhibiting overt signs of decline and addiction, saw defendant, who added gabapentin and naproxen to his drug regime without reducing his oxycodone dosage. On the morning of December 29, 2009, Haeg's mother found him dead in his apartment from a fatal dose of oxycodone, which was amplified by "a moderately high therapeutic" amount of Xanax.

Moreover, Gharibo testified that, based on Haeg's profile and history, the prescriptions written for him by defendant on December 26, 2009 created a "very high" risk to Haeg of a wide spectrum of ill effects, which included "overdosing due to misusing [the] medication and dying from respiratory death." Based on this testimony, it was reasonable for the jury to infer that defendant was using his prescriptions not to treat legitimate pain but to feed an addiction to opioids, and, with respect to Haeg, that he knew the patient would consume the medication in a manner consistent with a person who is taking it in such quantities to achieve and maintain a narcotic high, not for its therapeutic benefits, and that he consciously disregarded the possibility that, in taking the medication in such quantities, Haeg could die.

According to Gharibo, defendant also wrote medically unjustified prescriptions for Rappold, who appeared at defend-

ant's clinic in July 2009, complaining of back and leg pain and claiming to have been taking 30 mg of Roxicodone four times per day. Without verifying Rappold's medical condition or ordering any tests, defendant prescribed Rappold the same very high dosage, but reduced the frequency to three times per day. On August 8, 2010, Rappold returned to see defendant, claiming he had hurt his back. While defendant noted "tenderness" and difficulty with a straight leg raise test, he did not diagnose the cause of the pain. Without further examination, defendant issued Rappold what Gharibo opined was a medically unjustified prescription for Roxicodone 30 mg pills four times a day and Xanax 2 mg pills twice a day. Rappold returned to defendant on August 14, claiming to have lost the previous week's prescription. Without checking to see if that prescription had been filled, and without recording any medical explanation for the decision to issue a prescription different from the one reported lost, defendant wrote Rappold a prescription for Percocet 10 mg four times daily and Xanax 1 mg three times daily. On September 11, 2010, Rappold told defendant that the prior prescription had not helped, and defendant then prescribed 90 Xanax 2 mg pills to be taken three times daily and 120 Roxicodone 30 mg pills to be taken four times daily, which, according to Gharibo, created "a high probability of overdose and death" even if taken as directed. On September 14, 2010, Rappold was found dead in his car from the combined effect of the Xanax defendant had prescribed and whatever oxycodone Rappold had taken along with it.

The People's theory is that, regardless of who prescribed the oxycodone ingested by Rappold immediately before his death, the Xanax that was unquestionably prescribed by defendant was a contributing factor in his death and thus served as a sufficient legal basis for the manslaughter charge. Defendant counters that, absent direct proof that the drugs prescribed by him combined to cause the death, no causal link can be drawn between his actions and Rappold's death. Defendant relies on *Burrage v United States* (571 US —, 134 S Ct 881 [2014]) in arguing that the People were required to establish a "but for" connection between the Xanax prescription and Rappold's death, and that the court erred in not so instructing the jury. We reject this position. *Burrage* interpreted specific causation language employed by Congress in the federal Controlled Substance Act, which language is not included in New York's manslaughter statute (Penal Law § 125.15). Moreover, the Court of Appeals, in *People v Davis* (28 NY3d 294 [2016]), which was decided after *Burrage*, reiterated that the causation element in a homicide case is satisfied when the People prove "(1)

that defendant's actions were an actual contributory cause of the death, in the sense that they forged a link in the chain of causes which actually brought about the death; and (2) that the fatal result was reasonably foreseeable" (28 NY3d at 300 [internal quotation marks, citations and brackets omitted]). Here, the Xanax prescription furnished by defendant to Rappold was a contributory cause of Rappold's death because it combined with the oxycodone Rappold also ingested, causing his death. Further, Rappold's death was reasonably foreseeable to defendant because, as Gharibo testified, defendant was prescribing oxycodone and Xanax in dosages that greatly increased the probability of death. Further, there was sufficient evidence that Rappold was taking the drugs to get high, and not for therapeutic purposes, and there was sufficient evidence for the jury to infer that defendant knew Rappold would take the Xanax in such a quantity that, combined with oxycodone, it would kill him.

We also affirm the convictions for criminal sale of a prescription for a controlled substance and for reckless endangerment. With respect to the former charge, the People had to prove that defendant "knowingly and unlawfully s[old] a prescription for a controlled substance" (Penal Law § 220.65), other than in good faith in the course of his professional practice. There is no adequate basis to overturn the jury's finding that 170 out of the 180 counts of criminal sale were proved beyond a reasonable doubt. The jury's determination with respect to the credibility of the People's expert testimony on these counts is given great weight, and defendant's general contentions regarding the improper nature of the prosecution and the proper nature of his usual prescription practices do not overcome the showing made by the People with respect to the medically unlawful prescriptions.

Regarding the reckless endangerment in the first degree convictions, there was ample evidence to support a finding that defendant's prescription and treatment practices with respect to these patients created an imminent danger of an overdose that could have been life threatening, which thereby evinced depraved indifference to human life. Defendant also makes the procedural argument that all the reckless endangerment counts (the three first-degree counts and the four second-degree counts) were improper because the indictment did not specify particular office visits or occurrences of prescriptions, but rather simply listed a time period so extensive that it was virtually impossible for defendant to have adequately ascertained which of his actions, visits, treatments or prescriptions were alleged to have created a risk to each relevant patient.

This argument is unpreserved, and we decline to review it in the interest of justice. As an alternative holding, we find it to be without merit. The general rule that a count is duplicitous if it charges more than one crime does not apply, where, as here, the charges are for continuing crimes (*see People v Hernandez*, 235 AD2d 367, 368 [1st Dept 1997], *lv denied* 89 NY2d 1012 [1997]). Contrary to defendant's claim, the indictment properly charged the reckless endangerment counts as continuing crimes. These charges against defendant were not based on a single prescription that recklessly endangered the patient. Rather, the theory was that each patient was endangered as a result of defendant's continuing prescriptions and overall course of treatment, which over time endangered the patient as the risks compounded. Further, under the circumstances here, there was no way that either defendant or the jury could have misunderstood which allegations about defendant's conduct pertained to which count. Accordingly, the indictment also satisfied the specificity requirement, and provided defendant with sufficient information to prepare a defense and avoid double jeopardy.

We have considered and rejected defendant's remaining arguments, including those addressed to the weight of the evidence and to the court's charge. Concur—Manzanet-Daniels, J.P., Mazzarelli, Webber and Oing, JJ.