THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. JAMES C. VOELKER, Appellant.

Fourth Department, May 11, 1927.

Crimes — manslaughter, second degree — indictment charged murder, first degree, under Penal Law, § 1044, subd. 2 — decedent died after drinking liquid from bottle which bore Gordon gin label — jury warranted in finding that gin was made from wood alcohol purchased from defendant — defendant sold wood alcohol to said person as German grain alcohol — defendant guilty of culpable negligence — trial court properly submitted case to jury with instruction that it might find defendant guilty of manslaughter in second degree — new trial — claim by defendant that trial judge had intimated in conversation he intended to charge that verdict must be either guilty of murder in first degree or not guilty does not entitle defendant to new trial — sentence of defendant to fifteen years under Penal Law, § 1941, not justified by record — admission of conviction in Federal court of crime of criminally receiving stolen property is insufficient to show whether conviction was for crime which under our law was felony or misdemeanor — defendant's sentence must be indeterminate pursuant to Penal Law, § 2198 — Appellate Division has authority to correct sentence pursuant to Code of Criminal Procedure, § 543 — resentence will not prevent district attorney from thereafter filing information in accordance with Penal Law, § 1943.

The defendant was convicted of the crime of manslaughter in the second degree arising out of the alleged sale of poisonous alcohol from which synthetic gin was manufactured by the purchaser. The indictment charged the defendant with murder in the first degree under the common law form. The proof adduced on behalf of the People tended to establish the commission of the crime of murder in the first degree as defined in subdivision 2 of section 1044 of the Penal Law. The purchaser of some of the alcohol which was sold to him as grain alcohol, but which, in fact, was methanol, a synthetic wood alcohol, mixed it with other substances and concocted what he called gin. This he put into bottles bearing the label Gordon gin and sold a quart bottle on a Friday evening. The decedent drank some of the liquor and died from the poison contained therein. The defense was that the defendant purchased the alcohol as grain alcohol and was given an analysis which stated that it was what it was represented to be. The retail sale by the defendant from which the synthetic gin was concocted was made on a Tuesday or Wednesday preceding the purchase of the gin which caused the death of the decedent. The evidence shows that the defendant discovered by an analysis on Wednesday that the alcohol was poisonous. If the retail sale was made on Wednesday after this discovery was made, then the defendant knew at the time of the sale that he was selling poisonous alcohol, whereas if the sale was made on Tuesday, there is nothing in the evidence to show affirmatively that at the time of the sale the defendant knew that the alcohol was unfit for consumption.

The verdict of the jury finding the defendant guilty of manslaughter in the second degree makes the issue of the date of the retail sale unimportant, for assuming that the sale was made on Tuesday prior to the time when the defendant

ascertained that the alcohol was poisonous, the evidence shows that he was culpably negligent in failing to recall the alcohol which he had sold, and from which the gin was manufactured, the drinking of which resulted in the death of the decedent. While the defendant contends that he did not know to whom the sale was made, other evidence establishes the fact that he could have ascertained the name of the purchaser and that he made no effort whatsoever to recall the alcohol. The verdict of the jury is sufficiently supported by the evidence.

The trial judge in a personal discussion of the case with the counsel for the defendant intimated that he would charge the jury that their verdict must be either guilty of murder in the first degree or acquittal, and the counsel for the defendant assuming that the court would charge as stated, directed his summation along those lines. A new trial will not be granted because the court did not charge as he stated he expected to, but charged that the jury might find a verdict of manslaughter on the theory that the defendant was guilty of culpable negligence in not recalling the poisonous alcohol after it had been sold. Furthermore, defendant's counsel was interrupted in his summation by the district attorney and warned that he expected to contend that the defendant could be convicted of manslaughter. The misapprehension of the law by defendant's counsel is not ground for setting aside the verdict.

The sentence of the defendant to fifteen years of imprisonment under section 1941 of the Penal Law on the theory that he had been previously convicted of a felony was erroneous, for the only evidence to support that is the defendant's statement that he had been convicted in a Federal court of the crime of criminally receiving stolen property. There is nothing in the record to show whether or not that crime would be a felony under our laws. Since the record does not establish that the defendant had previously been convicted of a felony his sentence should have been indeterminate under section 2198 of the Penal Law.

The Appellate Division under section 543 of the Code of Criminal Procedure may correct the sentence, and for that purpose the Appellate Division directs that the defendant be brought before it for resentence.

Such resentence for a first offense will not prevent the district attorney thereafter filing an information warranted by the facts, in accordance with the provisions of section 1943 of the Penal Law, to have determined the question whether the defendant should be punished as one previously convicted of a felony.

APPEAL by the defendant, James C. Voelker, from a judgment of the County Court of the county of Erie, rendered on the 20th day of December, 1926, convicting him of the crime of manslaughter, second degree, and also from an order entered in the office of the clerk of the county of Erie on the 12th day of January, 1927, denying defendant's motion for a new trial made upon the minutes.

*Ernest W. McIntyre*, for the appellant.

*Guy B. Moore, District Attorney*, for the respondent.

SEARS, J. The defendant has been convicted of the crime of manslaughter in the second degree and sentenced to fifteen years' imprisonment in a State's prison. The indictment is in the common-law form for murder in the first degree for the killing of Nellie

McCarthy. The proof adduced on behalf of the People was directed toward the establishment of murder in the first degree as defined in the 2d subdivision of section 1044 of the Penal Law, namely, the killing of a human being "By an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual."

A brief outline of the facts is as follows: Nellie McCarthy died on the morning of Sunday, July 25, 1926, from wood alcohol poisoning. The defendant's connection with her death depends on a chain of events. On Tuesday or Wednesday, July twentieth or twenty-first, the defendant, who was engaged in the business of selling alcohol and other intoxicants surreptitiously, sold to another person named Maischoss, who was in the same business, five gallons of what purported to be grain alcohol but what was in fact a substance known as methanol, a synthetic wood alcohol, unquestionably poisonous. Maischoss mixed some of the liquid with other materials — flavoring, glycerine, magnesia and water — to concoct what he called gin, and put it into bottles which had Gordon gin labels on them. On Friday evening Maischoss sold a quart of this gin to Charles Murphy. Murphy stopped to get this at Maischoss' home. At that time Murphy was one of a party of five, including, beside himself, Nellie McCarthy (the deceased), a woman named McGovern, who lived in the same apartment with the deceased, and two men, one of whom was named Lennon, and the other of whom is unidentified in the record. They were on their way by automobile to some point on the shore of Lake Erie where they intended to go in bathing. Previous to starting on this bathing trip, Mrs. McCarthy, Lennon and Murphy had eaten supper together at the McCarthy apartment and had all three drunk at least a small quantity from a bottle labeled gin which Lennon had got at Maischoss' home on Thursday night. According to Maischoss' testimony he had no gin at that time except such as he had made up from the alcohol purchased by him from the defendant. On Friday evening when the party reached the lake shore, Mrs. McCarthy, Lennon and Murphy went in bathing. Miss McGovern and the third man did not. The bottle which Murphy had purchased from Maischoss was left in the back of the motor car while the bathers were away. When the bathers returned to the car Murphy noticed that the bottle had been opened and a small quantity of the contents was gone. Murphy then took a small drink of the contents of this bottle. Murphy testified that at that time he was sure Mrs. McCarthy drank some of its contents. The party returned to the McCarthy apartment and the bottle of gin

was brought in and put on the kitchen table. The unidentified man soon left. Miss McGovern went to her room and to bed. She had not drunk any of the gin at any time. Murphy soon became "dopey, stunned," as he expressed it, lay down and did not awake until Saturday afternoon. Miss McGovern found Mrs. McCarthy, Lennon and Murphy apparently sleeping on Saturday morning when she got up and came out of her room. She soon left the apartment to go to her work. When she returned about one o'clock in the afternoon she said that Mrs. McCarthy looked "very badly; * * * she had deep rings right down on her cheeks;" that "she was all black," and that "she had large, puffy eyes and a starey glare." Miss McGovern left the apartment at about twenty minutes to three o'clock. When Murphy awoke in the afternoon Lennon and Mrs. McCarthy were very sick — vomiting frequently. At about six o'clock on that afternoon Murphy went for a doctor. He returned and took Lennon to the hospital and had the hospital send an ambulance for Mrs. McCarthy. She was brought to the hospital and died before half past two o'clock in the morning of Sunday, July twenty-fifth. Lennon also died. An autopsy performed upon Mrs. McCarthy's body showed the presence of wood alcohol in the stomach and bladder contents. A bottle labeled Gordon gin was found by the police in the McCarthy apartment on Sunday morning at about twelve-thirty o'clock. It still held a very small quantity of liquid which on analysis proved to contain wood alcohol. The police also found there at the same time an empty bottle labeled London Gin — Burnett's.

The outline of this portion of the case is sufficient to show that the jury were warranted in finding that the wood alcohol which Mrs. McCarthy drank and which caused her death was part of that which Maischoss purchased from the defendant on Tuesday or Wednesday, July twentieth or twenty-first.

We now turn to the facts relating to the defendant's acquisition of the alcohol sold to Maischoss, to his knowledge of its character, and to his acts upon learning of its poisonous quality. On Sunday, July eighteenth, a man named Sapowitch came to the defendant's home and sold to the defendant ten drums of 110 gallons each of what Sapowitch then stated to the defendant to be German grain alcohol. The defendant himself testified that at the time of the purchase he was not only assured by Sapowitch that the product was German grain alcohol, but that Sapowitch had with him what he claimed was a sample and also a chemist's certificate that the liquid analyzed did not contain wood alcohol and was "O. K." Defendant before purchasing diluted some of the sample with water, smelled and tasted it and testified that it "smelled perfect."

Sapowitch at this time gave defendant the chemist's certificate. The defendant asserted on the witness stand that he had made previous purchases from Sapowitch and believed him trustworthy. It appears without dispute that what was afterwards claimed by Sapowitch to have been a sample of this liquid was delivered to a firm of chemists for analysis on Saturday, July seventeenth, and that the chemists on that day had issued a certificate to the effect that the sample did not contain wood alcohol. The certificate ended with the words, " This is O. K." This is the certificate which Sapowitch handed to the defendant at the time the purchase was made by the defendant. The chemists when sworn upon the trial admitted the issuance of this certificate but gave evidence to the effect that the certificate was incorrect and that the sample did actually contain wood alcohol. The liquid purchased by the defendant was delivered to him on Monday, July nineteenth. It came in metal drums. He at once had a large part of it poured from the drums into five-gallon containers. He was in and out of the place where this was being done while the change of containers was being made. He evidently began at once to dispense the liquid in various quantities to customers. The sale to Maischoss was on Tuesday or Wednesday. It is his claim that complaints from customers that the alcohol did not smell right came to him on Tuesday evening. One customer of defendant's that night returned some of the alcohol that he had bought earlier in the day. On Wednesday morning the defendant took a quantity of the liquid to the same chemists who had given the previous certificate of analysis and asked to have another test made. This was done while he waited. The chemists told him after the test was made that the liquid was unfit for use and gave him a written certificate to the effect that it contained wood alcohol in large quantities. The defendant testified that he did not read the certificate and did not learn at this time that it contained wood alcohol. There is, however, evidence that one of the chemists told him of this fact on this occasion. In the afternoon of the same day he returned to the chemists with Sapowitch and a third person and an argument ensued as to the character of the liquid. During this argument one of the chemists stated definitely that the liquid contained wood alcohol in large quantities. The defendant became excited and left the laboratory. He claims that he then communicated with all his customers who had not previously made complaints or brought the material back, telling them to bring back what they had received or notifying them what they had got from him was not fit for use. This he did as far as he knew who his customers were. On Thursday night he went to New York with Sapowitch, as he says, at Sapowitch's request and

cost, to help find out what the liquid really was and to help Sapo-witch show to the persons from whom Sapowitch had bought the material that it had been found unfit for use.   On Tuesday morning, having learned of investigations by the police, he returned to Buffalo and voluntarily gave himself up.

The question most earnestly litigated at the trial related to the day on which the Maischoss purchase from the defendant of five gallons was made.   The sale and delivery without question occurred between one and two o'clock in the afternoon.   The People's witnesses swore that it was on Wednesday; the defendant's on Tuesday.   The date was highly material for if it was on Wednesday it was after the defendant had been told by the chemist that the liquid was not fit for use and after the defendant had actually received from the chemist a certificate containing the statement that wood alcohol was present in large quantities.   If, however, it was on Tuesday there is nothing to show affirmatively that at the time of the sale the defendant knew that the liquid was unfit for use or contained wood alcohol; and the defendant's testimony is to the effect that at that time he believed the alcohol to be potable because of Sapowitch's statement, the sample Sapowitch showed him and the certificate of the analysis of the chemists dated Saturday, July seventeenth, which set forth that the liquid was free from wood alcohol and " O. K."

The verdict of the jury finding the defendant guilty of man-slaughter in the second degree makes this issue relatively unim-portant.   If the sale was on Wednesday culpable negligence would be a charitable interpretation of defendant's act.   Even assuming the truth of the defendant's contention and viewing the case on the basis of a sale on Tuesday, the verdict still finds warrant in the evidence.   The defendant himself testified that on Tuesday night he made a simple test by putting a small quantity of the liquid in hot water and smelling it.   He then found that it gave off a bad odor from which he recognized that the liquid was bad.   He was present as stated above when some of the drums which he had bought were being opened and their contents transferred to small containers, yet he did not make the effort to test it at that time by his sense of smell.   His knowledge of the danger and the prevalence of poisonous alcohols is shown by his conversations with Sapowitch and all the proof in relation to chemical analyses.   Further than this, after he was warned of the danger and assured of the presence of wood alcohol in the liquid by the chemist, he did not notify Maischoss.   His reason as already stated is that he did not know who he was.   Maischoss, however, testified not only that he had sold the defendant gin some years previously, but that when he

spoke to the defendant at the meeting which resulted in the sale, he opened the conversation by saying that his name was Maischoss and that he had been sent to the defendant by a man named Blair. It is argued on behalf of the People in support of this testimony that the defendant would not have been apt to run the risk of selling what he thought was alcohol in violation of the Volstead Act without some knowledge of the purchaser's identity. On the other hand, defendant testified that although he did not know who Maischoss was, his face was familiar to him and that he knew " he was a bootlegger." The defendant does not specifically deny that Maischoss told him he was sent by Blair. The defendant made no effort to look him up through Blair, but was content to leave word at his own home and at his sister's that if a man whom he described came back either for more alcohol or to make complaint he should be told to bring back what he had because it was unfit for use and he should be paid back his money.

On the merits, therefore, the defendant's guilt of the crime of which he has been convicted is supported by the evidence.

We entertain no doubt that the learned trial court was right in submitting the case to the jury with instruction that they might find the defendant guilty of manslaughter in the second degree. (*People* v. *Koerber*, 244 N. Y. 147.)

The defendant on a motion for a new trial, however, made an argument, and urges it in this court, that the defendant was not given a fair trial on account of a rather peculiar circumstance. It appears that in a casual conversation held on the street between the trial judge and the defendant's counsel during an adjournment of the trial when the taking of the evidence was almost completed, counsel asked the judge if he intended to charge the jury that the jury's verdict must be either guilty of murder in the first degree or not guilty, and the judge replied in the affirmative. This was also in accordance with a previous casual statement of the trial judge of his view of the law made a day or two earlier. The defendant's counsel in reliance on these statements included the following in his argument to the jury: "And I think, Your Honor, that I am not transgressing the laws of the court to say to the jury that I understand the court will charge you that it is your duty, if you find this defendant guilty as charged in the indictment, to find him guilty of murder in the first degree and if you find that he is not guilty of murder in the first degree, you must find him not guilty."

At this point the district attorney interrupted, saying: " No, that is not what I understand." The defendant's counsel rejoined: " I understand the court is going to charge that," and the court said: " Proceed, anyway. We will take care of that matter later."

The defendant's counsel continued and gave but brief attention to the matter of culpable negligence, although he did mention both negligence and recklessness in the course of the summing up and stated at least one reason why, as he argued, the defendant could not be found to have been reckless. The district attorney in his argument dealt more elaborately with the subject of manslaughter in the second degree by culpable negligence. The court charged that the defendant might under the evidence be convicted of this crime. We do not think there was error in denying the motion for a new trial under these circumstances. The statement of the judge out of court could certainly not amount to more than an indication of his view of the law at that time. The court was not committed. He could charge the jury according to his view of the law at the time the charge was made. This was his duty. The defendant's counsel during his argument was sufficiently warned by the district attorney of the latter's view which we may presume the district attorney was prepared to support by argument and authority if called upon to do so. Still though warned the defendant's counsel touched rather lightly on the subject. He dealt with it to some extent. He doubtless believed that the question of manslaughter was not open under the indictment. He thought the court shared this belief. Nevertheless he must have known that if the court was convinced that that question was open it was the court's duty to submit it to the jury. It was the counsel's view of the law rather than any statement of the court which really was the cause for his course of action. Counsel's misapprehension of the law, however natural, is not ground for setting aside the conviction. After excepting to the court's charge relating to manslaughter in second degree, as applied to the facts, he made four affirmative requests dealing expressly with manslaughter. The facts brought to our attention fall far short of establishing that the defendant was denied a fair trial.

The sentence of the defendant to fifteen years' imprisonment is not justified by the record. It is presumably based upon a finding of a previous conviction of a felony. (Penal Law, § 1941, as amd. by Laws of 1926, chap. 457.) The practice provided in section 1943 of the Penal Law (as added by Laws of 1926, chap. 457) was not followed. (*People* v. *Gowasky*, 244 N. Y. 451.) The defendant upon being questioned before sentence admitted a conviction in a Federal court of the crime of criminally receiving stolen property. The record is insufficient to show whether that conviction was for a crime which under our law was a felony or misdemeanor. As the record fails to establish either by his admission or otherwise that he has previously been

convicted of a felony, his sentence must be indeterminate. (Penal Law, § 2189, as amd. by Laws of 1919, chap. 411.) This court is authorized to correct the sentence. (Code Crim. Proc. § 543; *People* v. *Salter*, 191 App. Div. 723; on motion for reargument, 192 id. 435.) For this purpose the defendant should be brought before this court for the pronouncing of the proper judgment on his conviction. (*People* v. *Bretton*, 144 App. Div. 282; *People* v. *Scheuren*, 148 id. 324; *People* v. *Griffin*, 27 Hun, 595.)

Such resentence for a first offense will not prevent the district attorney thereafter filing an information warranted by the facts, in accordance with the provisions of section 1943 of the Penal Law to the end that the question may be properly adjudicated whether the defendant should be punished as one previously convicted of a felony.

The judgment of conviction and the order should be affirmed, except that the judgment is to be corrected by this court resentencing the defendant, for which purpose the defendant is to be brought before this court.

All concur. Present — HUBBS, P. J., CLARK, SEARS, CROUCH and TAYLOR, JJ.

Judgment of conviction and order affirmed, except that judgment is to be corrected by this court resentencing the defendant, for which purpose the defendant is to be brought before this court on May 17, 1927, at two P. M.